GLICKSTEIN, Judge,
concurring specially.
The plaintiff, Mr. Evans, had been a patrol sergeant for the Lake Park Police Department until he was transferred to the Town’s Department of Fire and Inspections, effective January 2,1985. The transfer was made at the direction of the Town Manager and implemented by the Chief of Police, Thomas Cammarano. Cammarano testified in his deposition that when Mr. Evans was transferred to code enforcement, he was still a police officer in the Town of Lake Park. Cammarano also testified that at the time Evans was transferred, the Town was consolidating code enforcement under the Department of Fire and Inspections. After that transfer, the police chief had no supervisory control over Mr. Evans.
After Mr. Evans was transferred to the Department of Fire and Inspections, he was assigned to work with John Waddell, the building official for the Town of Lake Park. Mr. Evans testified that after the transfer he was a road patrol sergeant assigned to the inspection department to investigate and detect code violations. He further testified that he was advised to go along with the building inspector and fireman to assist in the inspections. Evans was directed by Waddell to perform such tasks as looking in commercial areas for blocked fire exits and illegal storage. Waddell testified that the only individuals that were qualified to make building inspections were he and the Director of Fire and Inspection Services. Police Chief Cam-marano testified that all police officers are responsible for noting and bringing to a conclusion any and all code enforcement violations.
Prior to January 8, 1985, Waddell had directed the appellees not to work on the building site in question until they provided him with certain engineering test results. Waddell testified:
Well, I had stopped them [Appellees] from working on the job because I’d been promised some compaction tests on the footings, which I had not gotten. I don’t know, [Appellee] Prince or [Appellee] Roberts, I can’t recall which was which, but one of them was going to bring them down to the office to me and I told him I didn’t want any concrete poured or any *920 blocks laid or anything else. And I said we’re going to watch the job.
And Mr. Evans heard me and he was working in that area on code violations and he said, Well, I’ll check it for you, make sure. And I said that would be great, it will save me a trip out.
Waddell also suggested that Mr. Evans check to make sure that the contractors were not stuffing the cement blocks with paper to impede the flow of concrete in the walls of the building:
Yes, they were stuffing paper in there. I made them take it out. I did tell him [Mr. Evans] if he saw them doing that, if they were working, to make sure they weren’t doing that, but I was going back and check before they poured the concrete. I didn’t tell him specifically that he should go do it, but I did mention that they were filling the block with paper.
On January 8, 1985, the day of the accident, Mr. Evans went to the appellees’ building construction site twice. On that morning, Mr. Evans met appellee Prince and informed him that he was a code enforcement officer for the Town of Lake Park and that he was checking the job. According to Prince, Mr. Evans “came, made an inspection and left.” Prince testified that he knew that there would be municipal building officials on the job site during the construction. Prince also knew that the town required that either a building official or a certified engineer be present prior to a concrete pour.
That same day, in the afternoon, Mr. Evans went back to the construction site to observe the pouring of the concrete and to ensure that paper was not stuffed in the blocks. Mr. Evans came to the site the second time from the same direction as he did the first time and both appellees Prince and Roberts observed him approaching the building. Appellee Roberts testified that the second time Evans was on the construction site, “He came and made an inspection and left.” Prince confirmed that Mr. Evans watched the pouring of the concrete and that Mr. Evans was making sure that no paper was put in the blocks. Watching a concrete pour of a stem wall was a task typically performed by a building inspector.
When the concrete pour was finished, Mr. Evans asked appellee Prince how he should exit the construction site and appel-lee Prince led him over to the comer of the building where he had entered and said, “Step up across there and down this way.” While exiting that way, Mr. Evans was injured when a cleat on a board on which he stepped suddenly came unnailed and he fell stiff-legged to the ground, severely injuring his back.
The summary final judgment recited, in part:
Plaintiff, William E. Evans, was subject to the “Fireman’s Rule” at the time of his injury, since he had entered upon the premises of the defendants in the discharge of his duty as a police officer. The complaint fails to allege sufficient willful misconduct or wanton negligence on the part of the defendants which would injure the plaintiff; such allegations are necessary in order to survive the bar to recovery imposed by the Fireman’s Rule. Sanderson v. Freedom Savings and Loan Association, [496 So.2d 954] 11 F.L.W. 2298 (Fla. 1st DCA 1986); Rishel v. Eastern Airlines, Inc., 466 So.2d 1136 (Fla. 3d DCA 1985). Accordingly, the defendants’ motion for final summary judgment is granted.
Based upon the same review, the court finds the plaintiffs’ assertions as to the non-applicability of the “Fireman’s Rule” are not correct and plaintiffs’ motion for summary judgment as to defendants’ fifth affirmative defense (the Fireman’s Rule) is denied.
The “fireman’s rule” is the subject of a recent article by Robert D. Peltz, Esquire, The Transformation of The “Fireman’s Rule" From A Limited Premise Liability Doctrine Into An Illogical Broad Barrier to Fair Compensation, 17 Stet.L.Rev. 137 (1987), wherein the author initially urges Florida to follow the lead of Massachusetts and Oregon in abolishing the doctrine and replacing it with the “reasonable man” standard applied in other property owner situations. The article traces the “evolution” of the rule, its “metamorphosis” and *921 its “illogical extensions.” The author then makes the following analysis and recommendations:
If there is any justification whatsoever for distinguishing between the duty of care owed by a landowner to police or firemen on one hand and other members of the public on the other, it lies in those limited situations where firemen and policemen enter unusual parts of the premises at unforeseeable times and under circumstances of emergency. As noted by Dean Prosser, in such a situation, it is not reasonable to expect the landowner to take care in looking after the premises and preparing for the visit: “A man who climbs in through a basement window in search of a fire or a thief cannot expect any assurance that he will not find a bulldog in the cellar.” [69]
These limited situations, however, can easily be resolved by the approach which has been followed by a small number of courts. This approach requires that the landowner take precautions on his premises to protect police and firemen where it is reasonable to expect them to enter.[70] Under this rule, police officers and firemen are entitled to the status of invitees and the corresponding full duty of reasonable care under the same circumstances as other members of the public. This duty would thus apply in situations where the officers come to a part of the premises at a time that it is held open to the public; where they come to the premises for a purpose directly or indirectly connected with the business of the occupier; or where they enter with the landowner’s express invitation. In other circumstances, they would be owed the same duty of care owned to licensees. This rule does not pose any additional burden upon the landowner, since he is already under the obligation to exercise reasonable care to make his premises reasonably safe to other individuals under the same circumstances.[71]
An even preferable approach, which is followed by some states, is to simply do away with the invitee-licensee dichotomy and to substitute a standard requiring:
A landowner [to] act as a reasonable man in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk.[72]
Id. at 156-57.
I am concerned about the decision herein in view of the fact that two members of the court and an associate judge made a clear expression of the law as they perceived it in Berglin v. Adams Chevrolet, 458 So.2d 866 (Fla. 4th DCA1984). At oral argument in the present case I suggested there was no more emergency in Berglin than is involved in some emergency motions that are filed here.
In light of Dean Prosser’s above quoted observation, I fail to see the reason for applying the rule in a non-emergency situation; and I would en banc this case and certify the following question to the Supreme Court as one of great public importance:
DOES THE “FIREMAN’S RULE” APPLY TO LAW ENFORCEMENT OFFICERS AND FIREMEN IN NON-EMERGENCY SITUATIONS?
Fred Howland, Inc. v. Morris, 143 Fla. 189, 196 So. 472 (1940), is a half century old. The rule needs present review in light of (a) its impact, and (b) the question of the reasonableness of the rule in non-emergency situations.

. W. Prosser, supra note 6, § 61. See also Restatement (Second) of Torts § 345, comment c.

. See, e.g., Meiers v. Fred Koch Brewery, 229 N.Y. 10, 127 N.E. 491 (1920); and Mounsey v. Ellard, 363 Mass. 693, 297 N.E.2d 43 (1973). See also cases cited in W. Prosser, supra note 6, § 61 n. 92.

. See also Restatement (Second) of Torts § 345 (1965).

. Mounsey v. Ellard, 363 Mass. 693, 707-08, 297 N.E.2d 43, 52 (1973) (quoting Smith v. Arbaugh’s Restaurant, Inc., 469 F.2d 97, 101 (D.C.Cir.1972)).